MV TRANSPORTATION, INC., Appellant

v.

Richard G. ALLGEIER (Executor of The Estate of Barbara Allgeier, Deceased), Appellee.

No. 2012–SC–000462–DG.

Supreme Court of Kentucky.

June 19, 2014.

Gene Frederick Zipperle, Jr., Griffin Terry Sumner, Jason Patrick Renzelmann, Counsel for Appellant.

Bryan Todd Thompson, Scott Coleman Cox, Millicent Ann Tanner, Brian Scott Brownfield, Chad Owens Propst, Counsel for Appellee.

Kevin Crosby Burke, Counsel for Amicus Curiae Kentucky Justice Association.

Opinion of the Court by Justice VENTERS.

Appellant, MV Transportation, Inc., (MV) appeals from an opinion of the Court of Appeals that, as relevant here: 1) affirmed a jury verdict awarding compensatory damages for injuries Barbara Allgeier (Allgeier) sustained as a passenger on an MV bus; and 2) reversed a summary judgment by which the trial court had dismissed Allgeier's claim for punitive damages.[1]

As grounds for relief, MV contends the Court of Appeals erred by affirming two evidentiary rulings of the trial court relating to the bus driver's past alcoholism and by reinstating Allgeier's punitive damages claim. MV further asserts, in the alternative, that even if the punitive damage claim was properly reinstated, the Court of Appeals erred by remanding the case for trial upon the issue of punitive damages alone, rather than, in addition, a complete retrial upon all issues presented in the original trial. For the reasons explained below, we affirm the opinion of the Court of Appeals.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In our review of the trial court's award of summary judgment dismissing Allgei-

---

1. Allgeier died during the pendency of her appeal. For consistency with the Court of Appeals decision we refer to the claims and arguments as being pursued by Allgeier, even though the Executor of her estate, Richard G. Allgeier, has now been substituted into her position as the litigant in the case.

er's claim for punitive damages, we are required to view the evidence, and any reasonable inferences that may be drawn from the evidence, in the light most favorable to Allgeier, the party opposing summary judgment. *Steelvest v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky. 1991). Viewed accordingly, the facts are as follows.

MV operates the TARC 3 paratransit bus service in Louisville for the Transportation Authority of River City (TARC). A paratransit bus is a bus specially equipped with a lift to enable wheelchair-bound passengers to safely board and safely exit the bus. In 2006, Barbara Allgeier was a sixty-five year-old frequent passenger of MV's paratransit bus who used a wheelchair as a consequence of multiple sclerosis.

On a frigid day in December of 2006, Allgeier was returning home on an MV bus driven by Wilma Caldwell. The bus arrived at Allgeier's stop at approximately 5:00 p.m. Caldwell stopped the bus and initiated the routine procedures to operate the wheelchair lift for Allgeier. When the lift is properly operated a steel plate shifts into position bridging the gap between the floor of the bus and the floor of the lift so that a wheelchair can roll onto the lift. On this occasion, the plate was misaligned, and instead of facilitating access onto the lift, the plate obstructed it.

When disembarking, wheelchair-bound passengers are ordinarily unable to see the plate as they transition onto the lift, and therefore must depend upon cues from the driver to safely navigate onto the apparatus. MV's company policy explicitly requires drivers to assist wheelchair passengers as they negotiate their way onto the lift. On this occasion Caldwell failed to warn Allgeier that her access onto the lift was obstructed by the misaligned plate. As Allgeier attempted to roll onto the lift,

the wheelchair hit the obstruction and, tipped over. After this, Allgeier and her wheelchair were suspended in midair by the safety strap attaching the chair to the lift; Allgeier, at the same time, was held in the wheelchair by a safety belt. Caldwell reacted by releasing Allgeier's safety belt, causing Allgeier to fall out of the chair. She landed on the lift, which had by then been lowered, with such force that the femur of each of her legs splintered, causing extraordinary pain.

Instead of calling immediately for emergency medical assistance, Caldwell first contacted her MV dispatcher, as she had been trained to do. The dispatcher then notified MV supervisors Ronald Coleman and Leonard Rowe about the accident. Neither Caldwell, the MV dispatcher, Coleman, nor Rowe, immediately called for emergency assistance. Instead, Coleman and Rowe drove to the scene of the mishap, arriving there about fifteen or twenty minutes after the accident occurred. Some twenty-two minutes after Allgeier's fall, the first call was made for emergency medical services. Even then, MV personnel minimized the urgency of the situation by informing the emergency medical service that Allgeier was only experiencing "back pain." Consequently, the emergency paramedics did not respond with typical urgency; they arrived about 40 minutes after the injury.

All the while Allgeier was lying in intense pain on the metal lift in sub-freezing weather covered only with a thin blanket that had been brought to her by a nearby resident. The evidence presented at trial disclosed that upon their arrival Rowe and Coleman paid little attention to Allgeier's plight, and instead busied themselves with taking pictures and sequestering Caldwell from any inquiries about the incident. The police were never contacted and did

not otherwise arrive to conduct any kind of investigation of the mishap.

The evidence also indicated that MV trained its employees to guard against "fraudulent and excessive liability claims" by promptly photographing any accident scene. In furtherance of this objective, MV directed its supervisors to go immediately to an accident scene and take control as quickly as possible. MV's training material instructed drivers that "[u]nder no circumstances should you admit or acknowledge blame" for an accident.

As a result of her injuries, Allgeier was immobile for 225 days and remained, first in a hospital and then in a convalescence facility, for a considerable length of time. In contrast to the active lifestyle she maintained prior to the accident, afterwards she remained totally dependent on others for personal care and hygiene, and was unable to leave her home.

From the evidence presented at trial, a jury could reasonably conclude that Caldwell had substantially departed from the protocol established by MV's driver training manuals for safely unloading a wheelchair passenger, and MV essentially concedes that Caldwell was negligent in that regard. Allgeier also presented evidence indicating that MV's supervisors were lax in their training and enforcement of written safety policies. For example, MV supervisor Billy Grice testified that he did not instruct his driver-trainees in strict accordance with MV's written procedures, and that other trainers also failed to instruct on proper safety procedures. He testified that it was not "vital to go word for word" by MV's published policies. Throughout the trial several violations of company policies were identified and acknowledged by MV.

Evidence, which MV challenges as improperly admitted, also indicated that Caldwell was an alcoholic living in a reha-

bilitation facility in August of 2006 when she was hired by MV as a driver. Other evidence demonstrated that Caldwell had lied on her employment application about her alcoholism, and that she deceptively listed the facility's address as her home. Citing to MV's zero-tolerance policy, Rowe and Grice stated they would not have hired Caldwell had they known she was an alcoholic. Although MV's protocol generally requires that drivers involved in accidents be tested within two hours for alcohol consumption, more than two-and-a-half hours passed before Caldwell was tested; the test results were negative. Because the police were never called, no alcohol testing was done at the scene. Significantly, it was not alleged, and there was no evidence to indicate, that alcohol consumption played any role in the accident.

In November 2007 Allgeier filed suit against MV, alleging that her injury was caused by Caldwell's gross and ordinary negligence for which MV was liable under the doctrine of *respondeat superior.* Allgeier also asserted that her injuries were caused by MV's own gross and ordinary negligence in the hiring, training, supervision, or retention of Caldwell.

Prior to trial, the trial court granted MV's motion for summary judgment on Allgeier's punitive damages claim. After a six-day trial, the jury found that MV was vicariously liable under the doctrine of *respondeat superior* for Caldwell's negligence in causing Allgeier's injuries. The jury also found MV liable for its own, independent negligence "in hiring, training, supervising, or retaining its employee driver, Wilma Caldwell, and that this failure was a substantial factor in causing Barbara Allgeier's injuries." Allgeier was awarded medical expenses in the sum of $74,630.28, and $4,100,000.00 as compensation for past, present, and future pain and suffering. The jury apportioned no fault

to Allgeier. Allgeier then appealed the summary judgment dismissal of her punitive damage claim, and MV cross-appealed from the trial judgment awarding compensatory damages.

On discretionary review MV challenges the Court of Appeals' conclusion that the trial court improperly granted summary judgment dismissing Allgeier's punitive damage claim and the remand ordered by the Court of Appeals for a trial only upon the issue of punitive damages. MV also contends that the Court of Appeals should have reversed the trial judgment awarding compensatory damages because of error in admitting evidence of Caldwell's alleged alcoholism and mental health issues.

## II. EVIDENCE OF CALDWELL'S ALCOHOLISM WAS PROPERLY ADMITTED AS IMPEACHMENT EVIDENCE AND MV'S BROADER OBJECTION TO THE EVIDENCE WAS NOT ADEQUATELY PRESERVED

Prior to trial, MV filed a motion *in limine* to exclude any evidence that Caldwell had been treated in the past for alcoholism, depression, and anxiety. MV specifically challenged Allgeier's intent to introduce evidence that Caldwell was an alcoholic living in a rehabilitation facility when she was hired by MV as a driver a few months before the accident, and that she deceptively identified on the employment application the street address of the treatment facility as her home address, and lied about her alcoholism. Because there was no evidence that Caldwell was intoxicated when the mishap occurred, MV argued that there was no causal connection between Caldwell's alcoholism or emotional health and the accident. In response, Allgeier argued that the evidence MV sought to exclude would be admissible to show Caldwell's general unfitness

for the job and that MV was negligent in hiring her. Allgeier also argued that Caldwell's deceptive responses on her employment application were admissible for impeachment purposes because they cast doubt upon her credibility as a witness. The trial court agreed with the latter argument, stating: "If it's going to boil down to a credibility issue, [Caldwell] filled out the application. If they can show that she lied on the application, then I think that is an issue for her credibility."

Although MV disagreed with the trial court's ruling allowing introduction of the evidence for impeachment purposes, its complaint on appeal is that Allgeier exploited the ruling by disregarding the limited purpose for which the evidence had been admitted, and in addition used the evidence as substantive proof that MV was negligent in hiring Caldwell. The Court of Appeals rejected MV's argument, concluding that "[e]vidence of Caldwell's prior alcohol abuse [ ] was relevant to [Allgeier's] claims that Caldwell was negligently hired." On discretionary review, MV argues that the Court of Appeals erred in that conclusion.

While we decline to endorse the conclusion reached by the trial court on this issue, we nevertheless affirm on different grounds. We begin by noting that while any use of the evidence beyond attacking Caldwell's credibility was not compliant with the pretrial order limiting the use of alcoholism evidence to impeachment purposes, MV did not contemporaneously object on those occasions when Allgeier exceeded the *in limine* ruling and used the evidence for substantive purposes, and thus the argument is not appropriately preserved. *See* CR 46 (requiring "that a party, at the time the ruling or order of the court is made or sought, make[ ] known to the court the action which he

desires the court to take or his objection to the action of the court, and on request of the court, his grounds therefor").

Upon application of CR 46, we are constrained to conclude that this issue was not properly preserved for our review by MV's *in limine* motion alone. We examined this very issue in *Lanham v. Commonwealth,* 171 S.W.3d 14 (Ky.2005), where we held that while a motion *in limine* under KRE 103(d)[2] is a proper means for bringing anticipated evidentiary concerns to the attention of the trial court, the contemporaneous objection rule has not been repealed.[3] *Id.* at 20–21. As explained in *Lanham:*

> This is not to say, however, that a blanket motion *in limine* is sufficient to preserve an error for appellate review. As *Tucker* [4] correctly observed:
>
>> An objection made prior to trial will not be treated in the appellate court as raising any question for review which is not strictly within the scope of the objection as made, both as to the matter objected to and as to the grounds of the objection. It must appear that the question was fairly brought to the attention of the trial court ... One claiming error may not rely on a broad ruling and thereafter fail to object specifically to the matter complained of.
>
> *Id.*

While the trial court's *in limine* order clearly ruled that the evidence could be admitted to show Caldwell's lack of credibility, its ruling includes no reference whatsoever to Allegier's use of the evidence for substantive purposes. We will not infer from that silence that the trial court intended at the same time to hold that the evidence could not be used for substantive purposes so as to constitute a ruling in MV's favor. If anything, it suggests that the trial court intended to address the issue more explicitly at a later time when actually presented at trial. In any event, while it is true that MV's motion *in limine* challenged the substantive use of the evidence, nevertheless, we cannot say that the issue was "resolved by [an] order of record" as required for preservation by KRE 103(d).

■ We reiterate our recognition in *Lanham* that KRE 103(d) modified, but did not repeal, the contemporaneous objection rule of RCr 9.22, and, by extension, CR 46. Therefore, the critical point in preservation of an issue remains: was the question fairly brought to the attention of the trial court. See *Davis v. Commonwealth,* 147 S.W.3d 709, 722–23 (Ky.2004) ("Where a party specifies [in its motion *in limine* ] what evidence should be suppressed and why, the question has been 'fairly brought to the attention of the trial court' and the trial court's ruling preserves the issue for appeal.").

When, as MV argues on appeal, Allgeier misused and exploited the limited admissibility of the evidence at trial by shoehorn-

---

**2.** KRE 103(d) provides as follows: "A party may move the court for a ruling in advance of trial on the admission or exclusion of evidence. The court may rule on such a motion in advance of trial or may defer a decision on admissibility until the evidence is offered at trial. A motion *in limine* resolved by order of record is sufficient to preserve error for appellate review. Nothing in this rule precludes the court from reconsidering at trial any ruling made on a motion *in limine.*"

**3.** *Lanham* dealt with the interaction between KRE 103(d) and RCr 9.22, the criminal rule analog of CR 46. RCr 9.22 and CR 46 are virtually identical, and so produce the same evidentiary result in all circumstances.

**4.** *Tucker v. Commonwealth,* 916 S.W.2d 181 (Ky.1996) (overruled in *Lanham* on other grounds).

ing it in as substantive proof on the negligent hiring claim, the issue had not been resolved earlier by the pretrial order on the motion *in limine*. It was therefore incumbent upon MV at that point, i.e., when Caldwell's alcoholism was presented as substantive rather than impeachment evidence, to alert the trial court that Allgeier had gone beyond the explicit pretrial ruling, and was treading on unsettled territory. The reason for this rule is self-evident. A jury trial is a difficult and often complex undertaking. Like intricate machinery, it has many moving parts. The presiding judge is required to monitor those parts throughout the trial, remaining simultaneously attentive to a number of ongoing concerns. Having established in advance of trial the parameters for which admissible evidence may be used, the trial judge cannot be expected to then infallibly recognize the point at which those evidentiary boundaries have been crossed, and respond *sua sponte* with an unsolicited ruling.

 Therefore, if MV is correct in its contention that at trial Allgeier misused the evidence of Caldwell's alcoholism by going beyond the limits of the trial court's pretrial ruling, the issue should have been preserved for appellate review with a contemporaneous objection. Furthermore, in light of the trial court's ruling that the evidence was admissible for impeachment purposes and the lingering doubt about its use for other purposes, MV's remedy was to request a limiting instruction. KRE 105(a) provides:

> When evidence which is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for another purpose is admitted, the court,

upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly. In the absence of such a request, the admission of the evidence by the trial judge without limitation shall not be a ground for complaint on appeal, except under the palpable error rule.

As the rule plainly states, an admonition restricting the scope of admissible evidence is available "upon request," and in the absence of such a request, the trial court's failure to provide one cannot be regarded as grounds for appeal, subject to the exception of palpable error review for manifest injustice under CR 61.02.[5] Given the circumstances of this case, we are convinced that the lack of a limiting instruction did not result in a manifest injustice. Allgeier's theory of the case did not emphasize an allegation that Caldwell's alcoholism contributed to the accident. Indeed, Allgeier's counsel acknowledged in his opening statement that "there's no evidence that Miss Caldwell was intoxicated when she was operating the bus on December 8." In light of all the evidence presented, we are satisfied that the result of the case was not affected by the absence of a limiting instruction.

 Based upon our above discussion, we need not address MV's argument that the Court of Appeals erroneously concluded that the evidence of Caldwell's alcoholism was admissible in support of Allgeier's negligent hiring claim. However, the trial court specifically permitted the admission of the alcoholism evidence for purposes of impeachment, and so to that extent MV's motion *in limine* was resolved by order of record prior to trial. The issue of admissibility for that purpose was therefore pre-

---

5. CR 61.02: "A palpable error which affects the substantial rights of a party may be considered by ... an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error."

served. We conclude that the trial court did not err in that determination.

■■■ The trial court plainly regarded the misstatements in Caldwell's employment application as reflective of her general credibility as a witness at trial. A trial court has broad discretion in ruling upon the admissibility of impeaching evidence. We see no abuse of that discretion in this instance. The law favors the admission of evidence that is relevant to a jury's determination of a witness's credibility. *Baker v. Kammerer*, 187 S.W.3d 292, 295 (Ky. 2006) (quoting *Sanborn v. Commonwealth*, 754 S.W.2d 534, 545 (Ky.1988)[6]). ("The credibility of a witness' relevant testimony is always at issue and the trial court may not exclude evidence that impeaches credibility even though such testimony would be inadmissible to prove a substantive issue in the case.")

Caldwell's deception about her alcoholism and related problems on her application for employment with MV Transportation just a few months before the incident that injured Allgeier sufficiently implicated her credibility as a witness involving matters pertaining to her continued employment, and so we are persuaded that the trial court had an adequate basis for its pretrial ruling on the issue.[7]

■■ Finally, we agree with MV that, upon application of KRE 403 and KRE 404, the admission of past alcoholism or addiction is generally not admissible against a defendant or employer as substantive evidence to prove negligence or negligent hiring when unrelated to causing the injury to the plaintiff, and that sound public policy compels this result. In this case, however, the evidence was admissible as relevant to the impeachment of Caldwell's credibility because she lied in the recent past about her alcoholism on her employment application, not to show that she likely was responsible for the accident because of her past alcoholism. To the extent that proper admission of the evidence carried with it a justifiable concern for the prejudicial effect of its misuse, as noted previously herein, an appropriate admonition is the proper remedy, and that was not requested. KRE 105(a).

Accordingly, we affirm the Court of Appeals as to this issue, albeit on slightly different grounds.

## III. MV'S CONCESSION THAT IT WAS VICARIOUSLY LIABLE UNDER *RESPONDEAT SUPERIOR* FOR INJURY CAUSED BY ITS EMPLOYEES' NEGLIGENCE DOES NOT PRECLUDE A CLAIM BASED UPON ITS OWN INDEPENDENT NEGLIGENCE

MV conceded in the trial court that it would be vicariously liable under the doctrine of *respondeat superior* for any of Allgeier's injuries that were caused by Caldwell's negligence. MV argued that its concession that it was responsible for any damages caused by Caldwell's negligence precluded the claim that MV was directly liable for its negligence in the hiring, training, supervision, or retention of Caldwell. The trial court rejected MV's argument,

6. Overruled on other grounds by *Hudson v. Commonwealth*, 202 S.W.3d 17 (Ky.2006).

7. This result is not changed, as argued by MV Transportation, by KRE 404. The interplay between the impeachment rule and KRE 404 was examined in *Kentucky Farm Bureau Mut. Ins. Co. v. Rodgers*, 179 S.W.3d 815, 821 (Ky. 2005), wherein we concluded that "[s]uch impeachment testimony is not proscribed by ... KRE 404(b)." However, it bears emphasis that we do not intend to imply by our holding in this case that all prior lies told by a witness may freely be admitted to impeach a witness's credibility in all cases. *See* KRE 608; KRE 404; KRE 403.

and instructed the jury accordingly. The jury ultimately decided against MV under theories of both direct and vicarious liability.

We have not heretofore addressed this issue. The authorities are split on whether a separate negligent hiring claim should go forward when an employer concedes its liability for the negligent acts of its employee under the doctrine of *respondeat superior*. The rule advocated by MV, what we will refer to as the "preemption rule," [8] holds that once the employer concedes liability under *respondeat superior*, a plaintiff may not at the same time prosecute her claims for negligent hiring, training, supervision, and retention, and the defendant employer is instead entitled to summary judgment on those claims. MV urges us to follow the preemption rule, reasoning that allowing a negligent hiring claim to go forward after vicarious liability has been conceded serves no purpose other than to allow admission of highly prejudicial evidence of an employer's, or its employee's, allegedly bad character or prior misconduct—evidence that otherwise would be clearly inadmissible under KRE 404(b) if only *respondeat superior* is at issue—which prejudices the entire proceeding.

The rationale behind the preemption rule is that allowing a claim based on an employer's direct negligence in hiring or supervising an employee to proceed concurrently with claims based upon *respondeat superior* is redundant, unduly prejudicial to the employer, and could lead to duplicative damage awards. See *James v.*

*Kelly Trucking Co.*, 377 S.C. 628, 661 S.E.2d 329, 331 (2008). Decisions applying the preemption rule include *Oaks v. Wiley Sanders Truck Lines, Inc.*, 2008 WL 5459136 (E.D.Ky.2008) ("Once an employer defendant has admitted liability to plaintiff for its employee's negligence, the evidence laboriously submitted to establish the other theory of liability serves no purpose."); *Scroggins v. Yellow Freight Systems, Inc.*, 98 F.Supp.2d 928, 932 (E.D.Tenn.2000); *Cole v. Alton*, 567 F.Supp. 1084, 1086 (N.D.Miss.1983); *Willis v. Hill*, 116 Ga. App. 848, 159 S.E.2d 145, 153–54 (1967); [9] *Neff v. Davenport Packing Co.*, 131 Ill. App.2d 791, 268 N.E.2d 574, 575 (1971); and *McHaffie By and Through McHaffie v. Bunch*, 891 S.W.2d 822, 826 (Mo.1995) (collecting cases applying the preemption rule). Complicating the application of the preemption rule is a caveat adopted in some jurisdictions that allows a plaintiff to assert both theories of liability *if* a valid claim for punitive damages is presented. See, e.g., *Durben v. American Materials, Inc.*, 232 Ga.App. 750, 503 S.E.2d 618, 619 (1998).

Allgeier, on the other hand, argues in favor of a "non-preemption rule" whereby an employer's independent negligence in the hiring, training, retention, or supervision of an employee is regarded as conduct supporting a theory of liability that is distinctly different from, and is independent of, the negligence of the employee whose conduct directly caused the injury. That is the rule applied in this case by the trial court and affirmed by the Court of Ap-

**8.** We avoid the use of the terms "majority rule" and "minority rule" because there appears to be a fairly even split among jurisdictions in adopting the conflicting rules; indeed, the parties spend a considerable effort in attempting to prove which rule actually is in the majority. In any event, we generally place little weight on the absolute number of jurisdictions which have adopted a particular rule, and instead evaluate alternative rules of law based upon their merits, which may or may not correspond with their popularity among other jurisdictions.

**9.** Judgment reversed on other grounds in *Hill v. Willis*, 224 Ga. 263, 161 S.E.2d 281 (1968).

peals. The non-preemption rule posits that an employer may be liable for injuries caused both by its own independent negligence in hiring, training, retaining, or supervising an employee *and,* at the same time, under the doctrine of *respondeat superior* for the injuries caused by its employees' negligent behavior.

The Supreme Court of South Carolina comprehensively discussed the relative merits of the competing rules in *James v. Kelly Trucking Co.,* 661 S.E.2d at 329, and as a result, it rejected the preemption rule, citing in the process several reasons supporting its decision. First, we note that the *James* court recognized the separate and distinct nature of the two sources of liability: "[j]ust as an employee can act to cause another's injury . . . so can an employer be independently liable in tort." *Id.* at 332.

The court in *James* further reasoned that the preemption rule "presumes too much" because:

> Our court system relies on the trial court to determine when relevant evidence is inadmissible because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Rule 403 . . . . In our view, the argument that the court must entirely preclude a cause of action to protect the jury from considering prejudicial evidence gives impermissibly short-shrift to the trial court's ability to judge the admission of evidence and to protect the integrity of trial, and to the jury's ability to follow the trial court's instructions.

*Id.* at 331.

The *James* decision also notes a troubling procedural problem with the preemption rule's caveat for cases involving a claim for punitive damages. When determining whether a plaintiff's claim should proceed to trial "the trial court typically concerns itself only with whether the plaintiff's complaint states a factual basis to support a cause of action and whether, at the close of his presentation of the case, the plaintiff has presented a prima facie case supporting the allegations of his complaint." *Id.* However, under the preemption rule, at some pretrial stage the trial court would have to weigh the anticipated evidence to determine whether the plaintiff had a viable claim for punitive damages so as to permit the negligent hiring, training, supervision, and retention claims to proceed. This procedural formula, in turn, alters the traditional notion of the trial court's proper function in the early stages of the proceeding. *Id.* at 331–32. In Kentucky, that procedure could present a significant departure from our well-established standards for summary judgment and judgment on the pleadings. See *Steelvest,* 807 S.W.2d 476 at 480 (Ky.1991) (explaining the standard for granting summary judgment) and *Weller v. McCauley,* 383 S.W.2d 356, 357 (Ky.1964) ("[A] court should not dismiss for failure to state a claim unless the pleading party appears not to be entitled to relief under any state of facts which could be proved in support of his claim.").

Finally, in *James* the South Carolina court expressed what we now see as a fundamental flaw of the preemption rule, when it stated:

> In our view, it is a rather strange proposition that a stipulation as to one cause of action could somehow "prohibit" completely the pursuit of another. A plaintiff may, in a single lawsuit, assert many causes of action against a defendant. The considerations limiting a plaintiff's available causes of action in the typical case are that the plaintiff must be able to demonstrate a prima facie case for each cause of action and that a plaintiff

may ultimately recover only once for an injury.

661 S.E.2d 329 at 332.

Upon consideration of the two conflicting rules, the sound reasoning set forth in *James* persuades us that the non-preemption rule is the better course. Moreover, the non-preemption rule fits more consistently with other aspects of Kentucky law, including the summary judgment standards described above. Indeed, the preemption rule would seem to conflict with well-established authorities that permit a plaintiff to bring all claims justified by the defendant's conduct, even conflicting claims. In this vein, CR 8.01(1) provides in pleading a claim that "[r]elief in the alternative or of several different types may be demanded." The plain language of this provision would seem to encompass the right to assert claims against an employer as the master of a negligent employee under a theory of *respondeat superior* simultaneously with claims for liability based upon the employer's own negligence in hiring, training, retaining, or supervising the employee.[10] *See also* CR 8.05(2) ("A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or on equitable grounds or on both."); *Whitley v. Robertson County*, 406 S.W.3d 11, 17 (Ky. 2013) ("[A] plaintiff is the master of his own complaint, and is thus entitled to plead his cause of action among alternative courses of action as he deems best to pursue his litigation objectives.").[11]

We have no particular concern about the likelihood of double recovery under the non-preemption rule because a properly constructed jury instruction easily eliminates that possibility. *Penco, Inc. v. Detrex Chemical Industries, Inc.*, 672 S.W.2d 948 (Ky.App.1984) (citing Restatement (Second) of Judgments § 50 (1982)) ("[A] party aggrieved by the acts of another, or by the concurring acts or more than one person, is entitled to only one recovery.").

It is also worth noting that the non-preemption rule is consistent with Restatement (Second) of Agency § 213 (1958), which addresses the tort of negligent supervision and provides that a person conducting an activity through agents is independently subject to liability for harm resulting from *his own* conduct if he is negligent or reckless in supervising his agents. In further explanation of the tort, Comment h to § 213, entitled "Concurrent negligence of master and servant," states that "[i]n addition to liability under the rule stated in this Section, a master may also be subject to liability if the act occurs within the scope of employment. *In a given case [,] the employer may be liable both on the ground that he was personally negligent and on the ground that the conduct was within the scope of employ-*

---

10. Kentucky's recognition of torts based upon negligent hiring, negligent training, negligent supervision, and negligent retention is well established. See, e.g., *Turner v. Pendennis Club*, 19 S.W.3d 117, 121 (Ky.App.2000) ("Kentucky has indeed recognized and acknowledged the existence of claims of negligent training and supervision."); *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 291 (Ky. App.2009) (recognizing negligent supervision); *Oakley v. Flor–Shin, Inc.*, 964 S.W.2d 438, 441–42 (Ky.App.1998) (recognizing negligent hiring and retention).

11. For other authorities adopting the non-preemption rules see, for example, *McGraw v. Wachovia Sec., L.L.C.*, 756 F.Supp.2d 1053, 1066 (N.D.Iowa 2010) (there is a distinction between vicarious liability of a principal for the negligence of an agent and direct liability of the principal for its own negligence); *Fairshter v. American Nat'l Red Cross*, 322 F.Supp.2d 646 (E.D.Va.2004); *Poplin v. Bestway Express*, 286 F.Supp.2d 1316 (M.D.Ala. 2003); and *Lim v. Interstate Sys. Steel Div., Inc.*, 435 N.W.2d 830, 833 (Minn.Ct.App. 1989).

*ment."* (emphasis added); *See also* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on the Law of Torts,* § 70, at 501–02 (5th ed. 1984) ("Once it is determined that the man at work is a servant, the master becomes subject to vicarious liability for his torts. He may, of course, be liable on the basis of any negligence of his own in selecting or dealing with the servant, or for the latter's acts which he has authorized or ratified, upon familiar principles of negligence and agency law.").

■ In summary, because Kentucky law has recognized that a distinction exists between the vicarious liability of an employer and the actual liability of that employer; because the preemption rule would conflict with our civil rules and case authorities permitting alternative, and even conflicting, claims; because of the procedural flaws inherent in the preemption rule; and because the non-preemption rule comports more closely with our tort law traditions; we hold that a plaintiff may assert and pursue in the same action a claim against an employer based under *respondeat superior* upon the agent's negligence, and a separate claim based upon the employer's own direct negligence in hiring, retention, supervision, or training. The employer's admission to the existence of an agency relationship from which vicarious liability may arise does not supplant the claim that the employer's own negligence, independent of the negligence of the employee, may have caused or contributed to the injury.

## IV. PUNITIVE DAMAGES

The trial court granted MV's pretrial motion for summary judgment on Allgeier's claim for punitive damages, stating only that "the Court finds that there is no genuine issue of material fact that the Plaintiff ... is not entitled to punitive damages, such that MV Transportation is entitled to a Summary Judgment as a matter of law." The Court of Appeals found the trial court in error on that issue and remanded for a retrial upon the issue of punitive damages issue only.

MV contends that the trial court correctly granted summary judgment on Allgeier's punitive damages claim, and that the Court of Appeals erred by reversing the trial court's ruling on that issue. MV first argues that the evidence presented at trial did not support Allgeier's claim for punitive damages. Next, MV contends that, even if a punitive damage instruction should have been given, the Court of Appeals erred by remanding the case for trial only upon the issue of punitive damages. In MV's view, a trial limited to the issue of punitive damages violates KRS 411.186(1) and Section 7 of the Kentucky Constitution. We disagree, and affirm the opinion of the Court of Appeals.

■ Punitive damages existed at common law, and have been part of the fabric of Anglo–American and Kentucky jurisprudence for centuries.[12] "Such dam-

12. See *Wilkes v. Wood,* 98 Eng. Rep. 489, 498–99 (C.P.1763) (stating "a jury have it in their power to give damages for more than the injury received. Damages are designed not only as a satisfaction to the injured person, but likewise as a punishment to the guilty, to deter from any such proceeding for the future, and as a proof of the detestation of the jury to the action itself.") See also *Chiles v. Drake,* 59 Ky. 146, 151–52 (1859): "Puni-

tive, vindictive, and exemplary damages, are all synonymous terms.... The right, however, of the plaintiff to recover vindictive damages for personal injuries, where the commission of the act complained of is accompanied with circumstances of aggravation, has been repeatedly recognized by this court as proper, and this must now be regarded as a settled rule of law in this State."

ages are given to the plaintiff over and above the full compensation for his injuries, for the purpose of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example". *Hensley v. Paul Miller Ford, Inc.*, 508 S.W.2d 759, 762 (Ky.1974) (quoting Prosser, *Law of Torts* 4th Ed. § 2). "In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety, or property of others." *Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 59 (Ky.2013).

 An employer may be liable for punitive damages based upon the conduct of its employees. Further, "[e]ven where a single act of negligence might not constitute gross negligence, gross negligence may result from the several acts." *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 388 (Ky.1985) (quoting *Brown v. Riner*, 500 P.2d 524, 528 (Wyo.1972)). *Horton* expressly recognized that a finding of gross negligence and an award of punitive damages may be based, at least in part, upon evidence regarding the policies and procedures of the company. *Id.* at 388. Of particular significance in this case is KRS 411.184(3),[13] which provides a special rule for assessing punitive damages against an employer for the conduct of his employee. The section provides that, "[i]n no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question." See *University Medical Cen-*

*ter, Inc. v. Beglin*, 375 S.W.3d 783, 793–94 (Ky.2011).

## A. SUMMARY JUDGMENT DISMISSING THE PUNITIVE DAMAGE CLAIM WAS IMPROPER

 Sufficient evidence was presented at trial to establish that Caldwell, in conjunction with other MV. employees, engaged in conduct that a reasonable jury could easily have found to be negligence accompanied by wanton or reckless disregard for the life and safety of Barbara Allgeier. From the evidence a jury could have reasonably concluded that in the aftermath of Caldwell's initial ordinary negligence that caused Allgeier to fall, MV agents, including Caldwell, following policies put in place by MV, placed its own financial self-interests ahead of Allgeier's urgent need for medical assistance, and callously left Allgeier suffering helplessly in dire pain and distress in subfreezing weather for an unnecessarily prolonged period of time. The conduct described could without difficulty support an award of punitive damages. *Simpson County Steeplechase Ass'n, Inc. v. Roberts*, 898 S.W.2d 523 (Ky.App.1995) (for purposes of awarding punitive damages, malice may be implied from outrageous conduct and need not be expressed so long as the conduct is sufficient to evidence conscious wrongdoing); *Thomas v. Greenview Hosp., Inc.*, 127 S.W.3d 663 (Ky.App.2004)[14] (issue regarding punitive damages was for jury in medical malpractice case, which alleged that hospital's negligence led to bed-ridden patient's sacral decubitus ulcers).

Further, a reasonable jury could properly conclude from Allgeier's evidence, pursuant to KRS 411.184(3), that MV had

---

**13.** KRS 411.184 was held unconstitutional in *Williams v. Wilson*, 972 S.W.2d 260 (Ky.1998) to the extent it omitted the common law gross negligence standard.

**14.** Overruled on other grounds by *Lanham v. Commonwealth*, 171 S.W.3d 14 (Ky.2005).

ratified, authorized, or should have anticipated Caldwell's conduct. For example, the evidence demonstrated that MV was lax in training its drivers to comply with safety standards, and that Caldwell had been trained in the event of an accident to immediately call MV rather than 911 emergency assistance, even when medical assistance is of the utmost urgency. She had also been instructed not to speak to victims and witnesses. Similarly, MV supervisors also did not respond with an immediate call for medical assistance, but instead went to the scene to take control and assess the situation *before* seeking medical assistance for their injured passenger. There was also evidence that Caldwell's conduct substantially enhanced and aggravated Allgeier's damages in wanton disregard for her life and safety, and that Caldwell was complying with MV's policies and instructions at the time she engaged in that conduct. Moreover, MV could reasonably have anticipated Caldwell's compliance with company policies, and therefore could reasonably be regarded as having ratified her behavior.

In summary, from the evidence presented, a properly instructed jury could have reasonably concluded that MV's policy in the event of an accident was to place primary emphasis on avoiding tort liability rather than helping a severely injured passenger in need of immediate medical attention, and that its employees followed those procedures in wanton disregard for the life and safety of an injured passenger in the case at bar. Therefore, we agree with the Court of Appeals that the trial court erred in granting MV's motion for summary judgment dismissing Allgeier's claim of punitive damages.

## B. REMAND FOR RETRIAL ON PUNITIVE DAMAGES ONLY

In connection with the issue of punitive damages, MV further contends that if All-geier was erroneously deprived of her punitive damage claim, then the only proper remedy is a retrial of all of Allgeier's claims, including liability and compensatory damages, as well as punitive damages. According to MV, remanding the case to the trial court for a punitive damages determination requires vacating the verdict of liability and the verdict for compensatory damages, so that the jury that determines liability and compensatory damages will be the same jury that determines All-geier's claim for punitive damages and the amount thereof. In substance, therefore, MV argues that § 7 of the Kentucky Constitution and KRS 411.186(1) require that in order to vindicate her right to a jury's determination of punitive damages, Allgeier must retry all of her claims and thereby put her compensatory damage award at jeopardy. We do not agree.

### 1. Limited Retrial and Kentucky Constitution § 7

 Kentucky Constitution § 7 provides, "The ancient mode of trial by jury shall be held sacred, and the right thereof remain inviolate, subject to such modifications as may be authorized by this Constitution." We find nothing about a limited trial on punitive damages alone as ordered by the Court of Appeals that conflicts with the ancient mode of trial by jury. Moreover, we are not persuaded by the federal court decisions cited by MV relating to the federal right to trial by jury.

A trial on punitive damages may indeed re-plow much of the same factual ground covered by the first trial, but it poses no risk of the kind of conflicting or overlapping verdicts that concerned the United States Supreme Court in *Gasoline Prods. Co. v. Champlin Refin. Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931) ("Where the practice permits a partial new trial, it may not properly be resorted to

unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.").

The jury deciding the punitive damage claim will not decide any of the same questions decided by the jury in the first trial. The general liability question decided by the jury in the first trial will not be addressed by the jury that decides whether MV's conduct warrants punitive damages. Whatever the next jury decides about punitive damages will not be in conflict with any verdict determined in the first trial.

Similarly, if the jury determines that punitive damages are appropriate, the amount awarded will not duplicate or conflict with any part of the compensatory damages already awarded. MV's concern is based in part upon its belief that, if the jury at the first trial had the option of awarding punitive damages, it may have awarded a lesser amount as compensatory damages. To accept that argument, however, would require us to conclude that the jury violated its duty and the trial court's instructions by "padding" the compensatory damage award as a "de facto" exemplary or punitive measure of sorts. We have no reason to believe that occurred and we decline to speculate that it did. Under the circumstances confronting us here, we discern no violation of the right to trial by jury.

### 2. *Limited Retrial and KRS 411.186(1)*

KRS 411.186(1) provides that "[i]n any civil action where claims for punitive damages are included, the jury or judge if jury trial has been waived, shall determine concurrently with all other issues presented, whether punitive damages may be assessed." MV contends that this statute requires the retrial of all issues determined in the first trial so that the question of punitive damages may be "concurrently"

resolved. Plainly, the function of the statute is to provide that, in the initial trial, the jury will consider punitive damages at the same time it considers the verdicts of liability and compensatory damages claims, rather than, for example, in a separate punitive damages phase. Moreover, our adoption of MV's argument would mean that every time an appellate court in Kentucky determines that the issue of punitive damages was erroneously omitted by a trial court then the entire verdict and all aspects of it must be reversed and retried. Indeed, MV's reading of the statute, carried to its logical end, would also require a complete retrial if *any* issue was erroneously omitted because a new trial limited to any single issue would violate KRS 411.186(1) unless the punitive damage claim was concurrently tried. That is an absurd and unreasonable result which we decline to accept. *Wilburn v. Commonwealth*, 312 S.W.3d 321, 328 (Ky.2010) ("We refrain from interpreting a statute so as to produce an absurd or unreasonable result.").

MV Transportation does not challenge the amount of the compensatory damages returned in the initial trial as excessive; nor does it successfully assert any claim that the jury was improperly instructed. It was as a result of MV's own efforts, in combination with the trial court's erroneous ruling, which resulted in the original jury's inability to consider punitive damages. As such, MV bears responsibility for the improper omission of punitive damages in the first trial and the necessity of a new trial to determine the question. It would be fundamentally inequitable to require Allgeier to forfeit her compensatory damages verdict as a precondition for obtaining what she should have had in the first place—a jury's determination of whether she is entitled to punitive damages.

In any event, our case law supports a retrial upon punitive damages alone. For example in *Sand Hill Energy, Inc. v. Smith*, 142 S.W.3d 153 (Ky.2004), in the original trial in assessing punitive damages the jury was permitted to consider the defendant's extraterritorial conduct in awarding punitive damages. After the United States Supreme Court vacated and remanded the case to this Court, we remanded the case for a retrial solely upon the issue of punitive damages.[15]

We again addressed the very same issue in *Hyman & Armstrong, P.S.C. v. Gunderson*, 279 S.W.3d 93, 122 (Ky.2008) ("Sandoz argues that the issues of compensatory liability and punitive liability were so inextricably interwoven that a retrial solely on the issue of punitive damages would be in error. We do not agree. Retrial on a distinct and severable issue is permitted unless retrial would result in injustice[.]" citing *Deutsch v. Shein*, 597 S.W.2d 141, 146 (Ky.1980) (holding that retrial on a distinct and severable issue is permitted unless retrial would result in injustice)).

Here, we cannot conclude that issues of gross negligence and punitive damages are so inextricably interwoven with the issues of general liability and compensatory damages such that a retrial solely on punitive damages would be unjust. It is regrettable that much of the evidence at the original trial must be presented again upon remand for the punitive damage trial. That is an unfortunate inconvenience and expense, but it is an unavoidable consequence of the erroneous pretrial dismissal of the punitive damages claim. Certainly, MV's demand for a complete retrial on all issues would not minimize any of that expense and inconvenience.

By way of analogy, it is worth noting that criminal convictions are often remanded for a new sentencing trial, with the stakes sometimes being a life sentence, or even a possible death penalty. Thus if a remand is proper upon a lone issue in situations where an individual's freedom or life is at stake, a remand for a trial on punitive damages would seem, perforce, to be a reasonable and proper disposition.

## V. CONCLUSION

For the foregoing reasons, the opinion of the Court of Appeals is affirmed, and the cause is remanded to the Jefferson Circuit Court for a trial upon the issue of Appellee's claim for punitive damages.

All sitting. All concur.

**15.** We recognize that, in lieu of live testimony and consistent with the Kentucky Rules of Evidence, some recorded portions of the evidence from the first trial may be presented at the second trial. We further note that the award of compensatory damages and the amount thereof would be proper evidence since that information would have been available to the original jury had it been given the opportunity to consider and determine punitive damages. *Sand Hill*, 142 S.W.3d at 167.